

IN THE

# Court of Appeals of Indiana

Lei Gamble,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Mar 27 2025, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

March 27, 2025

Court of Appeals Case No.
24A-CR-1115

Appeal from the Marion Superior Court

The Honorable James B. Osborn, Judge

Trial Court Cause No.
49D21-2109-MR-27738

**Opinion by Judge Tavitas**
Chief Judge Altice and Judge Felix concur.

**Tavitas, Judge.**

## Case Summary

[1] Lei Gamble appeals his convictions for murder, a felony, and carrying a handgun without a license, a Class A misdemeanor. Seventeen-year-old Gamble and another teen attempted to rob, and then shot, a man in the parking lot of a gas station. Officers were able to quickly identify the suspects because the incident was recorded on surveillance cameras. During an interview with law enforcement, Gamble and his mother waived Gamble's juvenile rights, and Gamble admitted to robbing and shooting at the victim.

[2] On appeal, Gamble argues that his waiver of his rights was unknowing and involuntary and, thus, the trial court abused its discretion by admitting his statement to law enforcement. Gamble also argues that the trial court committed fundamental error in instructing the jury because, during deliberations in response to a jury question, the trial court directed the jury to disregard the accessory liability instruction. We conclude that Gamble and his mother signed the waiver knowingly and voluntarily and that the trial court did not abuse its discretion by admitting Gamble's statement. Moreover, any error in the admission of Gamble's statement was harmless given the overwhelming evidence in this case. Further, Gamble invited any error with respect to the jury

instruction and, invited error notwithstanding, Gamble has failed to demonstrate fundamental error. Accordingly, we affirm.[1]

## Issues

[3] Gamble raises two issues, which we restate as:

> I.   Whether the trial court abused its discretion by admitting Gamble's statement made to law enforcement.
>
> II.  Whether the trial court committed fundamental error when it instructed the jury to disregard the accessory liability instruction during deliberations.

## Facts

[4] On September 1, 2021, Felicia Harris was working for Lyft and was in the area of 42nd Street and Post Road in Indianapolis. Harris was approaching a red light next to a Marathon gas station when she heard a gunshot. Harris looked toward the gas station and saw two men near the driver's side of a parked vehicle. Harris saw one of the men firing a gun into the vehicle. Harris heard multiple gunshots and watched as the two men ran away. Harris drove into the gas station parking lot and approached the parked vehicle. She saw a man— later identified as Israel Raimundo Cruz—in the vehicle with bullet wounds to

---

[1] We held oral argument in this case in the Indiana Supreme Court Courtroom on March 7, 2025, as part of an event for legislative interns. We thank counsel for their presentations, the interns for their attention, and our Supreme Court for hosting the event.

his head, and she called 911. Law enforcement arrived on the scene and discovered that Cruz was still alive with gunshot wounds to the head. Cruz was transported to the hospital in critical condition.

[5] Detective Brian Sharp of the Lawrence Police Department quickly obtained surveillance video footage from the gas station and a nearby business. The videos showed a Volvo Crossover XC90 with a paper license plate and a sticker on the back window of the vehicle parked at a gas pump; the vehicle then drove around the gas station to where Cruz was parked. A woman with blonde hair was driving the vehicle. The vehicle drove past Cruz's vehicle and parked behind the gas station.

[6] Two men—later identified as Gamble and Isaiah Davie-Franks—exited the vehicle, approached Cruz's parked vehicle, and confronted him through the driver's window. Gamble opened the driver's side backseat door and got into the backseat while Davie-Franks remained at the driver's door. Suddenly, Gamble jumped out of the backseat, and both men started shooting toward Cruz. Gamble and Davie-Franks then ran away. Surveillance video depicted Gamble remove a white shirt and red hat and throw the clothing in the alley. Videos also depict the suspects returning to the alley shortly thereafter in their vehicle to retrieve the clothing.

[7] Officers located the suspects' vehicle through license plate readers placed around the city and determined the registered owner resided on Ellis Drive in Indianapolis. Officers went to Ellis Drive, located the vehicle, and observed a

woman with blonde hair exit the vehicle and enter an apartment building. The woman then returned to the vehicle and drove away. Officers initiated a stop of the vehicle and took the driver, Taleiah Gamble, into custody.

[8] Detective Sharp interviewed Taleiah, who identified her brother, Gamble, and Davie-Franks as the shooters. Officers then placed Gamble into custody at his home and brought him to the Lawrence Police Department to be interviewed. Gamble was handcuffed and was not free to leave at that time. Less than thirty minutes later, Gamble's mother, Letrice Myles, arrived.

[9] Detective Sharp and Myles joined Gamble in the interview room. Detective Sharp brought a two-part form ("Form") with him. The top half of the Form included an advisement of juvenile rights, including the right to remain silent, with signature lines for both the juvenile and the parent or guardian. The bottom half of the Form included a waiver of those rights with additional signature lines for both the juvenile and the parent or guardian. The Form is included below:



STATE'S
EXHIBIT
100

# JUVENILE WAIVER

Juvenile Respondent: Lei Gamble    Case No: CJ21-2977

## Warning of Rights

*Before we ask you any questions, you must understand your rights.*

1. *You may have one or both of your parents present.*

2. *You have the right to remain silent.*

3. *Anything you say can be used as evidence against you in court.*

4. *You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.*

5. *If you cannot afford a lawyer and you want one, one will be appointed for you by the court before questioning.*

6. *If you decide to answer questions now, without a lawyer present, you will still have the right to stop answering at any time. You will also have the right to stop answering at any time until you talk to a lawyer*

*My parents and/or legal guardian and I have read this statement of my rights and it has been read us, and my parents and/or legal guardian and I understand what my rights are. My parents and/or legal guardian and I have been allowed time by ourselves without the presence of a police officer to discuss the waiver of my rights before signing the waiver of rights.*

Date: 6:25 PM  9/25/21  Lei Gamble
                                         SIGNATURE OF RESPONDENT

Time: 9/25/                          _____
                                         SIGNATURE OF PARENT OR GUARDIAN

## Waiver

1. *I have read the above rights and I understand and know what I am doing.*

2. *I have been allowed time to consult with my parents or legal guardian without a police officer present.*

3. *I expressly waive the above rights and will answer any questions.*

Date: 9/1/21                        Lei Gamble
                                         SIGNATURE OF RESPONDENT

Time: 7:14 PM                    _____
                                         SIGNATURE OF PARENT OR GUARDIAN

Signed at 7:15 PM O'clock _____ M., this ___1___ day of September

20 21 , at    5150 M Post Rd.                          in the presence of-

_____
SIGNATURE

Ex. Vol. I p. 225.

[10] Detective Sharp read the advisement of juvenile rights section of the Form to Gamble and Myles. Gamble and Myles indicated that they understood the rights. Detective Sharp advised that he would leave the room to allow them to confer, and Myles asked, "So we basically talking about if he want to remain silent or not. If he want to tell you all information or no?" Ex. Vol. II p. 129.

Detective Sharp responded that Myles was correct and left the room to allow Myles and Gamble to confer.

[11] Myles and Gamble conferred for approximately fifteen minutes and then Detective Sharp returned to the interview room. Myles clarified with Detective Sharp that Gamble was not being waived into adult court by signing the Form. Myles also asked about viewing the video evidence. Both Myles and Gamble signed the top half of the Form, and Myles asked to talk with Detective Sharp in the hallway without Gamble. Myles and Detective Sharp conferred in the hallway for a few minutes and then returned to the interview room. Detective Sharp then read the bottom half of the Form dealing with Gamble's waiver of his rights to Myles and Gamble, and they discussed the impact of the waiver.

[12] In response to a question from Myles, Detective Sharp stated that Gamble was not yet under arrest; Detective Sharp also told them that he had proof Gamble was involved and that they were "trying to get [Gamble's] side of the story." Ex. Vol. II p. 143. Myles told Gamble, "It's up to you. You don't want to say nothing or you want to tell your truth or what?", and Detective Sharp stated, "The truth sets you free." *Id.* at 146. They also had the following discussion:

> [Myles:] If you don't say nothing then you don't say nothing. But either way it go, they gonna get the information, the s[**]t they need with or without your help. So you either help them -- maybe that'd be a little lenient toward your charge or whatever.
>
> [Gamble:] I guess.
>
> [Det. Sharp:] I can't promise --

[Myles:] I would think, but you know --

[Det. Sharp:] -- yeah, I can't promise (unintelligible) but like the truth always sets you free.

[Myles:] Don't you think it's more helpful to be, you know, helpful than not to say nothing?  Like they come and ask you and you don't want to say nothing then they come and -- and then you go --

*Id.* at 148.  Myles stated, "[w]e don't even . . . know why we here. . . .  He just said something about some guns."  *Id.* at 149.  Detective Sharp told them that information about the incident would "come out during the questioning" and gave Myles and Gamble more time to talk alone.  *Id.* at 150.  Myles and Gamble then conferred for approximately fifteen minutes.

[13]    When Detective Sharp returned, he read the waiver-of-rights portion of the Form to Gamble and Myles again.  Myles told Gamble, "They just really basically want to know your involvement in the robbery."  Ex. Vol. II p. 6.  Gamble agreed to answer some questions, and both Myles and Gamble signed the waiver of rights portion of the Form.

[14]    Detective Sharp informed Myles and Gamble that he was performing an investigation regarding a person that was shot.  He told them that Taleiah was at the police station as well.  Eventually, Gamble admitted that he approached Cruz in the gas station's parking lot and demanded Cruz's money; Gamble unlocked Cruz's vehicle and got into the backseat; Cruz reached for something;

Gamble heard a gunshot in the vehicle; and as Gamble ran away, Gamble shot toward Cruz's vehicle.

[15]    Subsequently, Gamble's fingerprint was found on the driver's side rear door window of Cruz's vehicle. Cruz died from his wounds two days after the shooting. An autopsy revealed that he had two gunshot wounds. The first bullet entered the left side of his nose and exited through his right ear. Gunpowder stippling indicated that the bullet was fired from a close range, likely twelve inches or less. The second bullet entered the back of Cruz's head on the left side and exited on the right side of his head. The autopsy revealed no evidence that the second bullet was fired from a close range.

[16]    The State charged Gamble with Count I, murder, a felony; Count II, felony murder; Count III, robbery resulting in serious bodily injury, a Level 2 felony; Count IV, pointing a firearm, a Level 6 felony; and Count V, carrying a handgun without a license, a Class A misdemeanor.[2] In Count I, the State alleged that Gamble "did knowingly kill another human being, to-wit: [Cruz]." Appellant's App. Vol. II p. 39. In Count II, the State alleged that Gamble "did kill another human being, to wit: [Cruz]; while attempting to commit robbery which is to knowingly take property from another person or the presence of

---

[2] The State also charged Taleiah and Davie-Franks. Davie-Franks pleaded guilty to felony murder and was sentenced to forty-five years in the Department of Correction ("DOC"). Taleiah pleaded guilty to robbery, a Level 2 felony, and was sentenced to thirty years with twenty years executed in the DOC, three years on home detention, and seven years suspended.

another person by using or threatening the use of force or by putting said other person in fear." *Id.*

[17]     In March 2023, Gamble filed a motion to suppress his statement to Detective Sharp. Gamble argued that he and Myles did not knowingly and voluntarily waive Gamble's right to remain silent pursuant to Indiana Code Section 31-32-5-1(a) because: (1) Myles "was operating on inaccurate and incomplete information from [Detective] Sharp"; and (2) "Gamble did not knowingly join the waiver as he did not have sufficient mental and emotional maturity." *Id.* at 116. Gamble also argued that newly enacted Indiana Code Section 31-30.5-1-6, which was scheduled to go into effect on July 1, 2023, and would govern the admission of juvenile statements made during a custodial interrogation, prevented the admission of Gamble's statement.

[18]     At the suppression hearing, Detective Sharp, Myles, and Jennifer Middaugh— one of Gamble's teachers—testified. Myles testified regarding her private conversation with Detective Sharp as follows:

> Q  During this private conversation, did Detective Sharp tell you that this was a homicide investigation? Or maybe he said a person shot investigation.
>
> A  I believe I -- I knew that. I think he brung that up before. I don't know. Something about a video or something. I don't know.
>
> Q  And did he tell you that [Gamble] was a suspect?
>
> A  Yeah.

Tr. Vol. II p. 29.

[19]  Middaugh testified that Gamble has an individualized education plan ("IEP") because of ADHD and his "verbal processing" and memory are in the "low range." *Id.* at 39.  As a seventh grade student, Gamble was reading at a second-grade level; in high school, Gamble was reading at a fifth or sixth grade level.  Middaugh testified that Gamble was quiet and "very well behaved in class," but Gamble was a "follower." *Id.*  Middaugh testified that Gamble was also doing regular coursework; he was on track to graduate; and he is "a very bright kid and very hardworking." *Id.* at 38-39.

[20]  In May 2023, the trial court issued an order denying Gamble's motion to suppress and found that "Gamble and Myles knowingly and voluntarily waived Gamble's right to remain silent." Appellant's App. Vol. II p. 145.  The trial court concluded that Indiana Code Section 31-30.5-1-6 was "not in effect when Gamble gave his statement and does not apply to this case." *Id.* at 146.  The trial court further concluded that, even if the new statute applied, Detective Sharp's statements "make no concrete promise of any penalty or promises of leniency." *Id.*

[21]  A jury trial was held in January 2024.  Gamble objected to the admission of his interview with Detective Sharp, and the trial court overruled Gamble's objection.  The State proposed a final instruction regarding accessory liability.  Gamble argued that the State's proposed instruction was confusing and that using the accessory liability instruction would confuse the jury given the felony

murder charge. The trial court decided to use the pattern accessory liability instruction over Gamble's objection. Final Instruction No. 25, as given by the trial court, provided:

> Aiding, inducing or causing murder is defined by statute as follows:
>
> A person who, knowingly or intentionally aids; induces, or causes another person to commit an offense commits that offense.
>
> Before you may convict the Defendant, the State must have proved each of the following elements beyond a reasonable doubt:
>
> > 1. The Defendant
> >
> > 2. knowingly or intentionally
> >
> > 3. aided, induced, or caused
> >
> > 4. another person to commit the offense of murder, defined as knowingly or intentionally killing another human being.
>
> If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of aiding, inducing, or causing murder, a felony, charged in Count II.
>
> Before you may convict the Defendant of this crime, you must find there is evidence of the Defendant's affirmative conduct, either in the form of acts or words, from which an inference of a common design or purpose may be reasonably drawn. The

Defendant's conduct must have been voluntary and in concert with the other person.

The Defendant's mere presence at the scene of the crime, or mere acquiescence in the commission of the crime, is insufficient to convict for aiding, inducing, or causing the crime charged in Count . [sic]

A person may be convicted of aiding, inducing, or causing murder even if the other person has not been prosecuted for the murder, has not been convicted of the murder, or has been acquitted of the murder.

Appellant's App. Vol. II p. 213.[3] While reading the instructions to the jury, the trial court noted the error in the second to the last paragraph and said, "this should be Count II." Tr. Vol. IV p. 167.

---

[3] Indiana Pattern Jury Instruction—Criminal Instruction No. 2.1600 provides:

Aiding, inducing or causing _____ [*name offense*] is defined by law as follows:

A person who, knowingly or intentionally _____ [aids] _____ [induces] _____ [causes] another person to commit an offense commits that offense.

Before you may convict the Defendant, the State must have proved each of the following elements beyond a reasonable doubt:

1. The Defendant

2. _____ [knowingly] _____ [intentionally]

3. _____ [aided]

[or]

_____ [induced]

[or]

_____ [caused]

4. _____ [*name other person*] to commit the offense of _____ [*name offense*], defined as _____ [*define elements of offense*].

[22]     During closing arguments, the State argued that Gamble was responsible, in part, due to accessory liability. Gamble's counsel argued that bullets from Gamble's gun did not strike Cruz and, thus, Gamble was not guilty of murder. In rebuttal, the State agreed that the first bullet, which struck Cruz's nose, was likely shot by Davie-Franks but argued that it was possible the second bullet, which struck the back of Cruz's head, was shot by Gamble.

[23]     During deliberations, the jury asked, "[I]n regard to final instruction 25[,] do all points 1, 2, 3, and 4 need to be proven beyond a reasonable doubt to find the defendant guilty of murder, a felony count II?" Appellant's App. Vol. II p. 225. The State argued that Final Instruction 25, as written, made it seem the State "charged Count II as an aiding, inducing, and causing murder and [it] didn't. [The State] charged felony murder, which is completely different." Tr. Vol. IV pp. 173-74. The State argued that the accomplice liability instruction applied

---

If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of aiding, inducing, or causing _____ [*name offense*], a Level _____ [*specify grade of felony*] felony, charged in Count _____.

Before you may convict the Defendant of this crime, you must find there is evidence of the Defendant's affirmative conduct, either in the form of acts or words, from which an inference of a common design or purpose may be reasonably drawn. The Defendant's conduct must have been voluntary and in concert with the other person.

The Defendant's mere presence at the scene of the crime, or mere acquiescence in the commission of the crime, is insufficient to convict for aiding, inducing, or causing the crime charged in Count _____.

A person may be convicted of _____ [aiding] _____ [inducing] _____ [causing] _____ [*name offense*] even if the other person has not been prosecuted for the _____ [*name offense*], has not been convicted of the _____ [name offense], or has been acquitted of the _____ [name offense].

Instruction No. 2.1600. Aiding, Inducing or Causing an Offense., Ind. Pattern Crim. Jury Inst. 2.1600. "[W]hile it is "preferred practice" to use pattern jury instructions, we do not require it." *Ramirez v. State*, 174 N.E.3d 181, 199 (Ind. 2021).

to Counts I and III but not to Count II and that Final Instruction 25 conflicted with Preliminary Instruction 7, which defined felony murder. Gamble then renewed his objection to the accessory liability instruction. Both the State and Gamble agreed that the trial court should instruct the jury to disregard Final Instruction 25. The trial court then instructed the jury to disregard Final Instruction 25.

[24] Later, the jury asked whether the accessory liability statute applied to Count I for murder. The State argued that the trial court should merely tell the jury to re-read the instructions. Gamble argued that the State charged Count I as "regular knowing and intentional murder, not aiding, inducing or abetting," and accessory liability did not apply to Count I. *Id.* at 179. Gamble asked the trial court to instruct the jury to disregard "anything about accomplice liability." *Id.* The trial court instructed the jury to re-read the instructions and continue to ignore Final Instruction 25.

[25] The jury found Gamble guilty as charged. Due to double jeopardy concerns, the trial court sentenced Gamble only for the murder and carrying a handgun without a license convictions. The trial court sentenced Gamble to forty-eight years for the murder conviction, with forty-five years in the Department of Correction, two years on home detention, and one year suspended to probation. The trial court imposed a concurrent one-year sentence for the carrying a handgun without a license conviction. Gamble now appeals.

## Discussion and Decision

### I. Gamble's Statement to Law Enforcement was Admissible.

[26] Gamble challenges the admission of his statement to Detective Sharp. The trial court has broad discretion to rule on the admissibility of evidence. *Taylor v. State*, 223 N.E.3d 260, 264 (Ind. Ct. App. 2023). We review a trial court's ruling on the admission of evidence "for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id.* When an appellant's challenge to such a ruling raises a constitutional issue, it is a "question of law, and we consider that question de novo." *Id.*

[27] Gamble argues that he was subjected to a custodial interrogation and, thus, the "safeguards of both the *Miranda* warning against self-incrimination and the juvenile waiver statute are implicated" by the admission of his statement to Detective Sharp during his trial. Appellant's Br. p. 13. The State concedes that Gamble was subject to a custodial interrogation but argues that Gamble knowingly and intelligently waived his rights and agreed to the interview with Detective Sharp.

### A. Juvenile Rights and Waiver of Those Rights in Indiana

[28] Our Supreme Court has noted that the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment, and Article 1, Section 14, of the Indiana

Constitution[4] "protect the privilege against self-incrimination and ensure that only a person's voluntary statements can be used against that person in a criminal prosecution." *D.M. v. State*, 949 N.E.2d 327, 332-33 (Ind. 2011). The privilege applies "when law enforcement interrogates a suspect who is in custody" and also "prohibits the use of compelled statements in juvenile delinquency proceedings." *Id.* at 333. "The Supreme Court of the United States's groundbreaking *Miranda v. Arizona* decision adopted the now-famous '*Miranda* warnings.' 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966)." *B.A. v. State*, 100 N.E.3d 225, 230 (Ind. 2018). The warnings "apply to suspects under custodial interrogation, who must be told that they have 'a right to remain silent, that any statement [they do] make may be used as evidence against [them], and that [they have] a right to the presence of an attorney, either retained or appointed.'"[5] *Id.* (quoting *Miranda*, 384 U.S. at 444).

---

[4] Gamble makes no separate argument regarding the Indiana Constitution.

[5] Our Supreme Court has held:

> A criminal suspect's right to counsel is a cornerstone of a fair trial, guaranteed by both the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana State Constitution. These separate provisions extend similar protections—the right to counsel at any critical stage of a criminal proceeding "where counsel's absence may derogate from the accused's right to a fair trial." *Caraway v. State,* 891 N.E.2d 122, 126 (Ind. Ct. App. 2008). However, the Indiana right provides greater protection because it attaches earlier—upon arrest, rather than only when "formal proceedings have been initiated" as with the federal right. *See Taylor v. State,* 689 N.E.2d 699, 703-04 (Ind. 1997) (internal quotation marks omitted).

*State v. Taylor*, 49 N.E.3d 1019, 1024 (Ind. 2016).

[29] In 1972, our Supreme Court held that "special caution" must be used in the context of juvenile confessions and that certain procedural safeguards must be used in addition to those required by *Miranda*. *D.M.*, 949 N.E.2d at 333 (citing in part *Lewis v. State*, 288 N.E.2d 138, 142 (Ind. 1972)). In response to our Supreme Court's holding in *Lewis*, the General Assembly codified Indiana Code Section 31-32-5-1, which governs the waiver of rights guaranteed to a juvenile, and currently provides, in relevant part:

> Any rights guaranteed to a child under the Constitution of the United States, the Constitution of the State of Indiana, or any other law may be waived only:
>
> * * * * *
>
> (2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:
>
>> (A) that person knowingly and voluntarily waives the right;
>>
>> (B) that person has no interest adverse to the child;
>>
>> (C) meaningful consultation has occurred between that person and the child; and
>>
>> (D) the child knowingly and voluntarily joins with the waiver[.]
>
> * * * * *

[30] "By permitting a court to find waiver in only these limited circumstances, 'the statute affords juveniles with greater rights than the Constitution requires.'"

*T.D. v. State*, 219 N.E.3d 719, 725 (Ind. 2023) (quoting *R.R. v. State*, 106 N.E.3d 1037, 1043 (Ind. 2018)). "[The statute] allows an unemancipated juvenile to waive *Miranda* rights only through counsel or a custodial parent, guardian, custodian, or guardian ad litem." *B.A.*, 100 N.E.3d at 231. "If the statute is not followed, the State cannot use any statements as evidence." *Id.*

[31] Our Supreme Court has held that four requirements "must be satisfied before a juvenile's statements made during a custodial interrogation can be used in the State's case-in-chief." *D.M.*, 949 N.E.2d at 333-34.

> First, both the juvenile and his or her parent must be adequately advised of the juvenile's rights. Second, the juvenile must be given an opportunity for meaningful consultation with his or her parent. Third, both the juvenile and his or her parent must knowingly, intelligently, and voluntarily waive the juvenile's rights. Finally, the juvenile's statements must be voluntary and not the result of coercive police activity.

*Id.* at 334 (internal footnotes and citations omitted).

[32] "The State bears the burden of proving beyond a reasonable doubt that the juvenile received all of the protections of Indiana Code section 31-32-5-1, and that both the juvenile and his or her parent knowingly, intelligently, and voluntarily waived the juvenile's rights." *Id.* (internal citation omitted). "Thus, assessing the validity of a juvenile's waiver requires conducting two separate voluntariness analyses—the voluntariness of the juvenile's waiver and the voluntariness of the parent's waiver." *Id.* at 339.

## B. Voluntariness of the Waiver

[33] "In determining the voluntariness of a *Miranda* waiver, we examine the totality of the circumstances surrounding the interrogation to determine whether the suspect's choice 'was the product of a free and deliberate choice rather than intimidation, coercion, or deception' and whether the waiver was 'made with a full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon [them].'" *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

[34] Indiana Code Section 31-32-5-4 provides the following factors to consider in determining the voluntariness of the juvenile waiver:

> In determining whether any waiver of rights during custodial interrogation was made knowingly and voluntarily, the juvenile court shall consider all the circumstances of the waiver, including the following:
>
> (1) The child's physical, mental, and emotional maturity.
>
> (2) Whether the child or the child's parent, guardian, custodian, or attorney understood the consequences of the child's statements.
>
> (3) Whether the child and the child's parent, guardian, or custodian had been informed of the delinquent act with which the child was charged or of which the child was suspected.
>
> (4) The length of time the child was held in custody before consulting with the child's parent, guardian, or custodian.
>
> (5) Whether there was any coercion, force, or inducement.

(6) Whether the child and the child's parent, guardian, or custodian had been advised of the child's right to remain silent and to the appointment of counsel.

*See also D.M.*, 949 N.E.2d at 339-40.

[35] The State agrees that Gamble was in custody and that "the procedural safeguards from *Miranda* and the statutory safeguards found in Indiana Code Section 31-32-5-1" apply to Gamble. Appellee's Br. p. 20 n.3. Gamble does not argue that he and Myles were denied the opportunity for a meaningful consultation, that they were not adequately advised of Gamble's rights, that they did not understand the consequences of Gamble's statements, or that Gamble was held in custody for a long period of time before consulting with Myles. Rather, Gamble argues that his waiver was involuntary because: (1) as a result of Gamble's intellectual disability, he did not understand the importance of the waiver; (2) Detective Sharp would not tell Myles or Gamble what he was investigating; and (3) Detective Sharp led Myles and Gamble to believe that the truth would set Gamble free and that Gamble was not under arrest. Gamble argues that, under the totality of the circumstances, the waiver of his right against self-incrimination was not knowing and voluntary.[6]

---

[6] Gamble also argues that his statement to Detective Sharp was inadmissible under Indiana Code Section 31-30.5-1-6. This statute was not in effect at the time of Detective Sharp's interview with Gamble, although it was effective on July 1, 2023, before the trial. This statute provides that a juvenile's statement is inadmissible if the law enforcement officer communicates: "(A) materially false information regarding evidence relating to the act; or (B) a materially false statement regarding: (i) the penalty for the act; or (ii) leniency in the imposition of a penalty for the act. Ind. Code § 31-30.5-1-6. Gamble, however, cites no authority that this statute is retroactively applicable to an interview taken prior to its enactment. We agree with the trial court that this statute was not applicable here because it was enacted **after** the interview occurred.

Accordingly, we now address the voluntariness factors at issue here to determine whether both Myles and Gamble executed the waiver voluntarily.

## 1. Was the Waiver Impacted by Gamble's Physical, Mental, and Emotional Maturity?

[36] The first factor we must consider is "[t]he child's physical, mental, and emotional maturity." Ind. Code § 31-32-5-4(1). On this factor, the trial court found: "That it might have taken more time and consultation for Gamble to fully understand the waiver is likely true, but nothing in Gamble's interactions with Detective Sharp point to any confusion or lack of understanding of the concepts discussed." Appellant's App. Vol. II p. 144.

[37] The evidence demonstrated that seventeen-year-old Gamble had an IEP, read at a fifth or sixth grade level, and struggled with verbal processing.[7] His teacher, Middaugh, explained that it takes Gamble "a couple of times to understand what you've said to him." Tr. Vol. II p. 39. According to Middaugh, however, Gamble was also doing regular coursework; he was on

---

[7] Gamble contends that he has an "intellectual disability." Appellant's Br. p. 18. The State notes that the term "intellectual disability" has a precise meaning pursuant to Indiana Code Section 35-36-9-2, which provides:

> As used in this chapter, "individual with an intellectual disability" means an individual who, before becoming twenty-two (22) years of age, manifests:
>> (1) significantly subaverage intellectual functioning; and
>> (2) substantial impairment of adaptive behavior;
> that is documented in a court ordered evaluative report.

That chapter, however, only "applies when a defendant is charged with a murder for which the state seeks a death sentence under IC 35-50-2-9." Ind. Code § 35-36-9-1.

track to graduate; and he is "a very bright kid and very hardworking." *Id.* at 38-39. Although the record indicates that Gamble struggled with reading and verbal processing, Detective Sharp repeatedly read the Form aloud to Gamble and Myles, answered their questions, and gave them opportunities to consult with each other as evidenced in the video recordings of the interview. Myles also explained the Form to Gamble. The record does not indicate that Gamble was confused about the Form or unable to understand his rights. This factor does not support Gamble's argument that his waiver was involuntary.

### 2. Were Gamble and Myles Informed of the Alleged Delinquent Act?

[38]    The next factor we consider is "[w]hether the child and the child's parent, guardian, or custodian had been informed of the delinquent act with which the child was charged or of which the child was suspected." Ind. Code § 31-32-5-4(3). The trial court found that Detective Sharp "informed Myles that he was investigating a homicide/shooting and that Gamble was a suspect." Appellant's App. Vol. II p. 144. According to Gamble, before Myles and Gamble signed the waiver, Detective Sharp refused to show Myles or Gamble videos of the crime or discuss the subject of the investigation. Gamble argues that they should have been informed that Detective Sharp was questioning Gamble regarding a "potential murder investigation." Appellant's Br. p. 17.

[39]    The record shows that, before Myles arrived in the interrogation room, she was told that law enforcement had video depicting Gamble. Before Myles and Gamble signed the waiver, Myles had a private conversation with Detective Sharp. Myles testified at the suppression hearing that she knew Detective Sharp

was investigating a shooting or homicide and that Gamble was a suspect. At the beginning of the third interview, as Gamble was signing the waiver, Myles told Gamble, "They just really basically want to know your involvement in **the robbery**." Ex. Vol. II p. 6 (emphasis added). Myles later expressed surprise that someone had been shot.[8] *Id.* at 9.

[40] The record, thus, indicates that, before signing the waiver, Myles at a minimum knew that Gamble was being accused of involvement in a robbery and that video evidence existed. The record, however, does not indicate whether Gamble was informed that Detective Sharp was investigating a shooting before Gamble signed the waiver. Accordingly, although the record shows that Myles was aware of at least one of the delinquent acts being investigated, the record does not reveal the same about Gamble. This factor, thus, somewhat favors Gamble.

## 3. Did Detective Sharp's Comments Constitute an Inducement to the Waiver?

[41] The final factor we must consider is "[w]hether there was any coercion, force, or inducement." Ind. Code § 31-32-5-4(5). On this factor, the trial court found:

> No coercion or force was used to get Gamble and Myles to agree to the waiver of his *Miranda* rights. Myles acknowledges that,

---

[8] The State contends "the record demonstrates that Detective Sharp informed **both Myles and Defendant** that he was conducting a criminal investigation and that he was investigating a shooting (Tr. Vol. II 20)." Appellee's Br. p. 26 (emphasis added). This conversation, however, happened after Myles and Gamble signed the waiver, not before.

while she inferred that Gamble would be released if he gave a statement, no promises were made.

Sharp made at least two statements that could be construed as an inducement. One, Sharp told Gamble and Myles that Gamble was not under arrest. This was clearly not true. Gamble had been taken into custody, placed in handcuffs, and transported to the police station. He was not free to leave. Moreover, Sharp had video evidence and testimony placing Gamble with a gun at the scene of a murder. The only reason to state to Gamble and Myles that Gamble was not under arrest was to leave the impression that his freedom was still an option.

Sharp's second comment, made repeatedly during the interview, was to tell Gamble: "the truth will set you free." Sharp made this comment immediately after Myles implored Gamble to tell the truth during the interview. Sharp said he made the statement to encourage Gamble to clear his conscience. Perhaps, but there is a long history of law enforcement officers donning the role of "father confessor" and making appeals to religious beliefs in interviews as a technique to obtain confessions.

Police deception, however, does not automatically render a confession inadmissible. Rather, it is only one factor to consider in the totality of the circumstances. *Clark v. State*, 808 N.E.[2nd] 1183, 1191 (Ind. 2004). Sharp's two statements may have encouraged Myles's feeling that Gamble would be able to go home, but it is not clear from the record that Sharp meant to encourage that impression, nor is it fair to accept Myles' feelings as reasonable or determinative under the circumstances. The Court's impression is that Myles, as a thinking being, understood the realities of her son's situation, including his rights and the effect of a waiver of those rights, but, as a feeling mother, held onto hope that the realities would not come to fruition.

Appellant's App. Vol. II pp. 144-45 (footnote omitted).

[42] According to Gamble, Detective Sharp induced him to waive his rights by implying that Gamble would be able to go home if he cooperated because Detective Sharp stated that the "truth would set him free" and that Gamble was not under arrest. Appellant's Br. p. 17. The State, however, points out the following conversation during the second video between Myles and Gamble:

> [Myles:] So basically if you don't want to answer none of his questions, you would just have to get an attorney. He won't have to -- he won't ask you nothing. But keep in mind you still going to be in custody until you get a lawyer or probation -- what they call it? Public defender; something like that.

Ex. Vol. II p. 137. This statement evinces Myles's knowledge that Gamble was not free to leave after the interview.

[43] Detective Sharp incorrectly stated that Gamble was not under arrest. Although Detective Sharp stated, "the truth will set you free," in the context of the statements, however, we cannot find that such statements amounted to an inducement to sign the waiver. We agree with the trial court that Detective Sharp's statements "make no concrete promise of any penalty or promises of leniency." Appellant's App. Vol. II p. 146. Overall, we conclude that this factor also somewhat favors Gamble.

### 4. The Waiver was Knowing and Voluntary Under the Totality of the Circumstances.

[44] Under the totality of the circumstances, we conclude that Myles' and Gamble's waivers were knowing and voluntary. We acknowledge that Gamble was not

specifically informed of the subject of the investigation by Detective Sharp and that Detective Sharp incorrectly stated that Gamble was not under arrest. These, however, are only two of the factors that we must consider. Detective Sharp repeatedly explained Gamble's rights to Myles and Gamble, explained the waiver, and gave Myles and Gamble opportunities to meaningful private consultations. Gamble was in custody a short time before he was able to consult with Myles; Myles was at least aware that Detective Sharp was investigating a robbery and that he had video evidence; and although Gamble had difficulty reading and with verbal comprehension, Detective Sharp and Myles repeatedly explained the waiver to him. Further, no evidence of coercion or force by Detective Sharp was presented. Our review of the interrogation videos supports the trial court's conclusion that both Gamble and Myles knowingly and voluntarily waived Gamble's *Miranda* rights.

## C. Any Error in the Admission of the Statement Was Harmless Error.

[45] Even if the trial court abused its discretion by admitting Gamble's statement into evidence, we conclude that any error was harmless. "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Koenig v. State*, 933 N.E.2d 1271, 1273 (Ind. 2010). This harmless error analysis "turns on a number of factors available to the reviewing court":

> These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative,

the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted and, of course, the overall strength of the prosecution's case.

*Id.* (citation omitted).

[46] Gamble first contends that his statement to law enforcement provided the only evidence of a specific intent to rob Cruz. Although relevant to the felony murder charge in Count II, the showing of a specific intent to rob Cruz was not required to convict Gamble of Cruz's murder in Count I. *Compare* Ind. Code § 35-42-1-1(1) ("A person who . . . knowingly or intentionally kills another human being . . . commits murder, a felony.") *with* Ind. Code § 35-42-1-1(2) ("A person who . . . kills another human being while committing or attempting to commit . . . robbery . . . commits murder, a felony."). Accordingly, this argument fails.

[47] Gamble also argues the videos were not clear enough to identify him, leaving only his fingerprint on Cruz's vehicle to identify Gamble. The surveillance videos, however, depicted Gamble and Davie-Franks approach Cruz's vehicle, struggle with Cruz, and then shoot their weapons at Cruz. The surveillance videos then clearly show Gamble and Davie-Franks run away and throw clothing in the alley. They returned to the alley seconds later in Taleiah's vehicle and retrieved the clothing. Taleiah's vehicle was easily identified and located by law enforcement, and Taleiah identified Gamble and Davie-Franks as the shooters. We conclude that, even without Gamble's statement, the

State's case against Gamble for murder was overwhelming. Any error in the admission of Gamble's statement was harmless beyond a reasonable doubt.

## II. Fundamental Error Did Not Result From the Withdrawal of the Accessory Liability Final Jury Instruction.

[48] Next, Gamble argues that the trial court committed fundamental error in instructing the jury. During deliberations, in response to a jury question, the trial court twice instructed the jury to ignore Final Instruction 25, which addressed accessory liability. Gamble now argues that this resulted in fundamental error because Gamble could only be liable through the theory of accessory liability. Gamble contends, "Unfortunately, in this case by placing the concept squarely before the jury, from *voir dire* through closing argument, and then not providing any instruction regarding accessory liability, the jury was free to apply the concept outside of the established statutory and caselaw parameters." Appellant's Br. p. 26.

### A. Standard of Review

[49] In general, we review the trial court's manner of instructing the jury for an abuse of discretion. *Ramirez v. State*, 174 N.E.3d 181, 195 (Ind. 2021). "If we find a challenged instruction to be erroneous, we presume that the error affected the verdict and will reverse the defendant's conviction unless 'the verdict would have been the same under a proper instruction.'" *Hardiman v. State*, 222 N.E.3d 1049, 1061 (Ind. Ct. App. 2023) (quoting *Gammons v. State*, 148 N.E.3d 301, 303 (Ind. 2020)), *trans. denied*. "Instructional error is harmless where a

conviction is clearly sustained by the evidence and the jury could not properly have found otherwise." *Cardosi v. State*, 128 N.E.3d 1277, 1288 (Ind. 2019).

[50] "Where, as here, a defendant fails to object to an instruction, he waives appellate review." *Miller v. State*, 188 N.E.3d 871, 874 (Ind. 2022). "But we may still review the instruction for fundamental error, a narrow exception to waiver." *Id.* An error is fundamental if it made a fair trial impossible or was a clearly blatant violation of basic and elementary principles of due process that presented an undeniable and substantial potential for harm. *Id.* (quotations omitted).

## B. Gamble Invited Any Error.

[51] First, the State contends that Gamble's argument is barred by the invited error doctrine. "The invited-error doctrine generally precludes a party from obtaining appellate relief for his own errors, even if those errors were fundamental." *Id.* at 874-75. "'[W]hen the failure to object accompanies the party's affirmative requests of the court, it becomes a question of invited error.'" *Batchelor v. State*, 119 N.E.3d 550, 556 (Ind. 2019) (quoting *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018)).

[52] Although the State initially proposed a final instruction regarding accessory liability, Gamble objected to giving the instruction in part because giving an accessory liability instruction would be confusing to the jury. Over Gamble's objection, the trial court decided to use the pattern accessory liability instruction. Later, when the jury asked questions regarding the accessory

liability instruction, Gamble renewed his objection to the accessory liability instruction. Both the State and Gamble then agreed that the trial court should instruct the jury to disregard Final Instruction 25, and the trial court instructed the jury to disregard Final Instruction 25.

[53]     Gamble, thus, objected to the giving of the instruction and affirmatively agreed during deliberations that the instruction should be withdrawn. Gamble now claims the instruction was necessary. We conclude that Gamble invited the alleged error and is precluded from obtaining appellate relief regarding this issue. *Miller v. State*, 188 N.E.3d 871, 875 (Ind. 2022) (holding that, assuming instruction was fundamental error, the defendant invited the error).

## C. The Withdrawal of the Accessory Liability Instruction Did Not Result in Fundamental Error.

[54]     Invited error notwithstanding, Gamble has failed to demonstrate that the trial court committed fundamental error when it withdrew the accessory liability instruction. Indiana Code Section 34-36-1-6 provides:

> If, after the jury retires for deliberation:
>
> > (1) there is a disagreement among the jurors as to any part of the testimony; or
> >
> > (2) the jury desires to be informed as to any point of law arising in the case;
>
> the jury may request the officer to conduct them into court, where the information required shall be given in the presence of,

or after notice to, the parties or the attorneys representing the parties.

"When the jury question coincides with an error or legal gap in the final instructions, a response other than rereading from the body of the final instructions is permissible." *Lohmiller v. State*, 884 N.E.2d 903, 912 (Ind. Ct. App. 2008).

[55] Here, Instruction 25 provided that it applied to Count II—the felony murder charge—but quoted the elements for Count I, murder. Further, there was confusion between the parties, the trial court, and the jury as to whether the accessory liability principles applied to the felony murder charge.

[56] Indiana Code Section 35-41-2-4 provides: "A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense, even if the other person: (1) has not been prosecuted for the offense; (2) has not been convicted of the offense; or (3) has been acquitted of the offense." In general, "there is no distinction between the criminal responsibility of a principal and that of an accomplice."[9] *McQueen v. State*, 711 N.E.2d 503, 506 (Ind. 1999). One may be charged as a principal yet convicted as an accomplice. *Id.* Accordingly, our Supreme Court "has repeatedly held

---

[9] We consider four factors in determining whether a defendant acted as an accomplice: (1) presence at the scene of the crime; (2) companionship with another at the scene of the crime; (3) failure to oppose commission of the crime; and (4) the course of conduct before, during, and after occurrence of the crime. *Castillo v. State*, 974 N.E.2d 458, 466 (Ind. 2012). "That a defendant was present during the commission of a crime and failed to oppose the crime is not sufficient to convict [him]." *Id.* Presence at and acquiescence to a crime, along with other facts and circumstances, may be considered though. *Id.*

that where one is charged as a principal it is **not error** to instruct on the crime of aiding in the commission of the crime when there is evidence to support such an instruction." *Id.* (emphasis added). "In such an instance, the instruction on accessory liability does not represent an additional charge or a new theory of the case." *Id.* Even in the context of felony murder, "a person is subject to conviction for felony murder based on accomplice liability for the underlying offense." *Dean v. State*, 222 N.E.3d 976, 989 (Ind. Ct. App. 2023), *trans. denied*.

[57] On appeal, Gamble contends that the instruction was required because the evidence pointed to him as an accomplice, not the person who fired the shots. During the State's rebuttal closing argument, the State conceded that Gamble did not fire the first bullet, which went through the front of Cruz's face. The State, however, argued that it was possible Gamble fired the second bullet, which went through the back of Cruz's head, making Gamble a principal to the crime, not an accessory.

[58] We addressed a similar issue in *Suggs v. State*, 883 N.E.2d 1188 (Ind. Ct. App. 2008). There, we noted that our Supreme Court has held, "'[w]here the facts in the case raise a reasonable inference that the crime was carried out with an accomplice, it is appropriate for the judge to give such an instruction.'" (quoting *Hampton v. State*, 719 N.E.2d 803, 807 (Ind. 1999)). It was unclear in *Suggs* whether the State was arguing that Suggs was an accomplice rather than a principal in the crime. On appeal, Suggs argued the trial court committed fundamental error by failing to instruct the jury regarding accomplice liability. This Court held, "even assuming that accomplice liability instructions should

have been given, . . . the alleged error did not result in fundamental error." *Id.* at 1192.  We noted:

> Ind. Code § 35-41-2-4, which governs accomplice liability, does not establish it as a separate crime, but merely as a separate basis of liability for the crime charged.  [A] defendant may be convicted on evidence of aiding or inducing even though the State charged the defendant as the principal.  Moreover, the State can change its theory of the case during the trial.  Finally, a defendant is equally guilty whether he acted as the principal or merely an accomplice, and while jury unanimity is required as to the defendant's guilt, it is not required as to the theory of the defendant's culpability.  Given this law, we cannot conclude that Suggs was denied fundamental due process even assuming that the State argued accomplice liability to the jury but no instruction was given.

*Id.* (internal citations and quotation marks omitted).  Moreover, we concluded that Suggs could not "establish substantial harm or substantial potential for harm due to the lack of accomplice liability instructions because the evidence was sufficient to convict him as a principal." *Id.*

[59]    As in *Suggs*, we cannot conclude that Gamble was subjected to fundamental error by the failure of the trial court to give an accessory liability instruction. Gamble argues that *Suggs* is distinguishable because the instruction here was initially given and then withdrawn.  We, however, presume that jurors follow the trial court's instructions.  *Weisheit v. State*, 109 N.E.3d 978, 989 (Ind. 2018). Accordingly, we presume that the jurors ignored the accessory liability instruction as instructed.  Moreover, while the errors in the instruction were unfortunate and resulted in some confusion, jury unanimity regarding whether

Gamble was a principal or an accessory was not required. *Suggs*, 883 N.E.2d at 1192. Under these circumstances, Gamble has failed to demonstrate fundamental error by the withdrawal of the accessory liability instruction.

## Conclusion

[60] The trial court did not abuse its discretion by admitting Gamble's statement to law enforcement and, even if the trial court abused its discretion, any error was harmless. Regarding the jury instructions, Gamble invited the error and, invited error notwithstanding, Gamble has failed to demonstrate fundamental error. Accordingly, we affirm.

[61] Affirmed.

Altice, C.J., and Felix, J., concur.

ATTORNEYS FOR APPELLANT

Talisha R. Griffin
Marion County Public Defender Agency
Indianapolis, Indiana

Jan B. Berg
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana